IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

Grubb & Ellis Company,        )
                              )
        Plaintiff,            )
                              )
    v.                        )      Case No. 1:08cv971(GBL)
                              )
Potomac Medical Building, LLC, )
                              )
        Defendant.            )

## MEMORANDUM OPINION

THIS MATTER is before the Court for a bench trial.  This case concerns Plaintiff Grubb & Ellis Company's breach of contract, procuring cause, quantum meruit, and fraud claims against Defendant Potomac Medical Building, LLC, for refusing to pay Plaintiff commissions following the consummation of a commercial leasing deal.  There are five (5) issues before the Court.  The first issue is whether the parties' Exclusive Agency Agreement was still in effect when the lease was signed on July 14, 2008, where, by its express terms, the Agreement expired on November 1, 2007, but Defendant sent Plaintiff an email on February 20, 2008, which stated, "Here's the extension."  The second issue is, if the original Agreement had in fact expired, whether the February 20, 2008, email and the parties' subsequent course of dealings with each other created a new, enforceable contract.  The third issue is whether Plaintiff was the procuring cause of the Stratford University lease where Plaintiff negotiated a non-binding letter of intent on February, 27, 2008,

ceased work on the transaction, and a later brokerage firm, Studley, Inc., negotiated additional material terms that ultimately led to a consummated lease. The fourth issue is, in the absence of an enforceable contract, whether Plaintiff is entitled to commissions under a quantum meruit theory where Plaintiff was not the procuring cause of the Stratford lease but conducted negotiations with Stratford and provided advertising services. The fifth issue is whether Defendant fraudulently concealed its intentions and fraudulently induced Plaintiff into continuing to work on the Stratford lease where Defendant indicated its intent to extend the Agreement and continued to direct Plaintiff to act on its behalf, but never actually signed an extension to the Exclusive Agency Agreement.

The Court finds for Defendant on all five (5) issues of fact. First, the Court finds that the Exclusive Agency Agreement automatically expired on November 1, 2007, because the express terms of the Agreement provided that it "shall be renewable upon mutual written agreement," but no written extension was executed prior to its expiration date. Second, the Court finds that the February 20, 2008, email and the parties' subsequent conduct did not create a new contract because the parties never signed the extension, they disputed the language contained therein, and unresolved concerns remained even after Defendant sent the email, all of which indicate that no meeting of the minds occurred.

2

Third, the Court finds that Plaintiff was not the procuring cause of the Stratford lease because Plaintiff ceased work on the Stratford transaction and the lease materialized only after Studley intervened and negotiated new material terms acceptable to both Defendant and Stratford University.  Fourth, the Court finds that Plaintiff is not entitled to recover under a quantum meruit theory because Plaintiff presented no evidence at trial showing that the services it actually performed were of any value.  Fifth, the Court finds that Defendant did not fraudulently conceal its intentions or induce Plaintiff to continue its work because: 1) Plaintiff failed to prove that Defendant never intended to extend the brokerage agreement; 2) it was unreasonable for Plaintiff to rely on any representations not contained in a signed written agreement; and 3) Plaintiff failed to prove that it is entitled to recover commissions or some other amount as damages.

## I.   FINDINGS OF FACT

A.   *The Exclusive Agency Agreement*

Between October of 2006 and December 18, 2006, Plaintiff Grubb & Ellis Company ("Grubb & Ellis") and Defendant Potomac Medical Building, LLC ("Potomac Medical") exchanged four versions of the Exclusive Agency Agreement ("Agreement") before reaching a final agreement as to the terms and conditions of the representation.  On December 28, 2006, Ms. Jessica Padgett of

3

Grubb & Ellis sent Mr. Emad Saadeh, the principal of Potomac Medical, a final executed copy of the fourth version of the Agreement with all initials and signatures intact.  (Def.'s Ex. 22.)  The fully executed and final version of the Exclusive Agency Agreement contained the following material provisions relevant to this lawsuit:

    i.    ¶ 2 provided that, "All sale/lease agreements and prospective purchasers and tenants shall be subject to the approval of the Owner in its sole discretion."

    ii.    ¶ 3 © of the Agreement stated:

"Notwithstanding other provisions of this Agreement, G&E shall cooperate with and encourage other real estate brokerage firms to secure purchasers/tenants for the property."

    iii.  ¶ 6 of the Agreement provided:

The Owner agrees to compensate G&E for services rendered pursuant to this Agreement according to the following commission schedule:

    LEASES

    (a)    Where G&E is the sole procuring broker in the transaction, G&E shall be paid four percent (4%) of the total aggregate base rental stipulated in the fully executed leases.

    (b)    When a cooperating broker is involved, defined as any broker other than those named as members of the Marketing Team (as defined in Section 8), G&E shall be paid six percent (6%) of the total aggregate base rental stipulated in the fully executed leases. The cooperating broker shall be paid three percent (3%) of the total aggregate base rental out of the proceeds paid to G&E.

4

iv.   ¶ 9 of the Agreement stated:

> This Exclusive Agency Agreement shall be effective
> as of the above date and it shall continue in full
> force and effect through October 31, 2007, and
> shall be renewable upon mutual written agreement.
> Either party may terminate this Agreement for any
> reason without penalty upon thirty (30) days prior
> written notice to the other party.  In the event
> of cancellation, G&E shall have the right to
> provide Owner with a list of bona fide prospects
> with whom there is an active interest in the
> Property.  This prospect list must be provided
> within fifteen business (15) days after the
> effective date of the termination.
>
> G&E shall have six (6) months in which to
> consummate an agreement with such registered
> parties, after which time Owner shall have no
> obligation to pay a commission under the terms of
> this Agreement.  Termination of this Agreement
> shall not relieve either party of its financial
> obligation to pay a commission under the terms of
> this Agreement.

(Pl.'s Ex. 1.)

By November 1, 2007, the date that the Exclusive Agency
Agreement was set to expire, the parties had not executed a
renewal by mutual written agreement.  However, the parties
continued to work with one another.  Grubb & Ellis continued to
provide brokerage services and remained listed as the agent for
Potomac Medical's property on CoStar, while Potomac Medical
continued its construction of the building.  At that time there
were no active prospective tenants for the building.

B.   *"Extension" of the Exclusive Agency Agreement*

In January 2008, Mr. Ed Bretz of Grubb & Ellis realized the Exclusive Agency Agreement had not been renewed and instructed Ms. Padgett to follow up with Mr. Saadeh to extend the Agreement. On January 31, 2008, Ms. Padgett sent Mr. Saadeh an email that stated, "The original listing agreement for Potomac Medical Center expired in October of this year [sic]. We overnighted an extension letter to your attention on October 5, 2007, and have not received a fully executed version for our files. I have attached both documents for your review." (Def.'s Ex. 23.) Mr. Keith Lipton, Executive Vice President and Managing Director of Grubb & Ellis's Washington, D.C., offices, signed the October 5, 2007, proposed extension letter just as he had signed the original Exclusive Agency Agreement. The proposed letter also contained a line for Mr. Saadeh's signature.

Subsequent to Ms. Padgett's email, Mr. Bretz repeatedly asked Mr. Saadeh by email for return of the extension letter, once on February 4, 2008 (Def.'s Ex. 26), and again on February 19, 2008 (Def.'s Ex. 27). Mr. Saadeh never signed or returned the proposed extension letter.

Mr. Saadeh was concerned about renewing the Agreement because he believed that an extension would bind him to working with Grubb & Ellis for an additional eighteen months. (Trial Tr., 152-53, July 9, 2009.) Mr. Saadeh wanted a proactive broker

6

who would take charge to get the building leased despite the slowing economy.  (Trial Tr., 152-53, July 9, 2009.)  He did, however, express a willingness to enter into an agreement that would protect Grubb & Ellis's right to a commission if Mr. Bretz drafted an agreement that specifically addressed commissions. (Trial Tr., 145, July 9, 2009.)  Mr. Bretz never drafted an agreement that specifically dealt with commissions; the only draft agreement sent to Mr. Saadeh was the October 5, 2007, proposed extension letter.  (Def.'s Ex. 23.)

On February 20, 2008, at 11:46 a.m., Mr. Saadeh sent Mr. Bretz an email that stated, "Here's the extension.  You remember the concerns that I have."  (Def.'s Ex. 28.)  The attached letter, however, stated, "please accept this letter as our intent to extend Grubb and Ellis listing agreement throughout the Stratford University transaction."  (Def.'s Ex. 28.)  Although the letter contained a place for his signature, Mr. Saadeh intentionally left the letter unsigned to secure further conversation about his concerns. (Trial Tr., 175, July 9, 2009.)

Mr. Bretz realized that Mr. Saadeh's letter was insufficient to act as an extension of the Agreement.  (Trial. Tr., 198-200, July 7, 2009.)  On February 20, 2008, at 1:23 p.m., Mr. Bretz replied to Mr. Saadeh's email and suggested that the parties set a date to discuss Mr. Saadeh's concerns.  (Def.'s Ex. 29.) Importantly, he also asked Mr. Saadeh to sign the attached

7

letter.  (Def.'s Ex. 29.)  Just over four hours later, on February 20, 2008, at 5:57 p.m., Mr. Bretz again emailed Mr. Saadeh, this time asking him to modify the language in the attached letter to read, "please accept this letter as an extension of the listing agreement through the conclusion of the current transaction negotiations with the current prospect, Stratford University. . . ."  (Def.'s Ex. 31.)  Mr. Saadeh neither signed nor modified the letter as requested. Furthermore, the parties never exchanged a signed extension letter, either the version produced Mr. Saadeh or the October 5, 2007, extension letter signed by Mr. Lipton.

Also in February, Mr. Saadeh began to seriously consider bringing in another broker to work on leasing Potomac Medical because he had concerns about Grubb & Ellis's performance. (Trial Tr. 146-51, July 9, 2009.)  Mr. Saadeh reached out to Mr. Glen Peacock of Studley, Inc., with whom he maintained contact for help in marketing the property.

C.  *Stratford University Negotiations*

Meanwhile, by the end of December 2007 and leading into early January 2008, Stratford University ("Stratford") identified Potomac Medical Center as a potential site for its Prince William County campus.  Stratford is a private educational institution that offers various associate, bachelor, and master degree programs with two campuses, one in Falls Church, Virginia, and

the other in Woodbridge, Virginia.  Mr. Craig Estey and Mr. Junius Tillery of UGL Equis, a global real estate firm that provides brokerage services for commercial clients, represented Stratford University.  The Equis brokerage team contacted Grubb & Ellis to express Stratford's interest in the Potomac Medical Center.

On February 27, 2008, Stratford University and Potomac Medical executed a non-binding proposal to lease, or letter of intent ("February LOI").  (Def.'s Ex. 66.)  Among other things, the February LOI contained a clause that stated, "Neither Landlord nor Tenant shall have any obligations regarding any provision set forth in this proposal unless a lease agreement is executed by both parties."  (Def.'s Ex. 66.)

Despite the execution of the February LOI, Mr. Saadeh had concerns about Stratford as a potential tenant.  Mr. Saadeh believed that Stratford was financially weak, and questioned why a university that conducted its level of business lacked an accounting program and had only an interim chief financial officer.  (Trial Tr., 162, July 9, 2009.)  He questioned why it had been in business for thirty years yet had no retained earnings to speak of.  (Trial. Tr., 163, July 9, 2009.)  He was also concerned because, as a university, Stratford was a unique tenant with unique tenant improvement needs.  (Trial Tr., 85-86, July 9, 2009.)

On Monday, March 3, 2008, Mr. Saadeh read an automated Dun & Bradstreet ("D&B") email alert sent to his work email account the previous Sunday. The alert notified him of a drop in Stratford University's credit rating.  (Trial Tr., 61, July 9, 2009.)  Mr. Saadeh immediately forwarded the email alert to his broker at Grubb & Ellis and to Stratford University's broker, Mr. Tillery.  (Def.'s Ex. 67.)

At some point during that week, Mr. Saadeh met with Mr. John Dovi, the acting Chief Financial Officer ("CFO") for Stratford University, along with Mr. Chris Bergstrom, the Regional President and Chief Credit and Risk Officer of Cardinal Bank.  Mr Bergstrom was Mr. Saadeh's banker in financing the construction of the Potomac Medical Center.  The parties met to discuss Mr. Saadeh's concerns over Stratford's financial viability given its intent to enter into a ten-year lease.  Stratford University's real estate broker was present with Stratford University represented.  Mr. Bretz was aware that Mr. Saadeh had scheduled this important meeting with Stratford University representatives and their broker but he made no effort to engage Mr. Saadeh about whether he should attend the meeting.

On March 12, 2008, the Wednesday of the following week, Mr. Bergstrom sent Mr. Saadeh an outline of concerns with Stratford University and noted the possibility of taking steps to enhance the security of the deal to include asking for personal

10

guarantees, obtaining a substantial letter of credit, or having Stratford University take responsibility for the tenant improvement ("build-out").  (Def.'s Ex. 69.)  Mr. Saadeh incorporated parts of the comments he received from Mr. Bergstrom and sent the comments to Mr. Bretz and asked that Mr. Bretz forward the information to Dr. Richard Shurtz, the President of Stratford University and to Stratford's brokers at Equis. (Def.'s Ex. 70 at 1746.)  Mr. Saadeh had, however, already copied Mr. Estey, who in turn forwarded the draft comments to Stratford University. (Def.'s Ex. 71.)  Mr. Bretz did not send the letters as directed by Mr. Saadeh.

D.  *Breakdown in Stratford Negotiations*

On Friday, March 14, 2008, Mr. Saadeh met with Dr. Shurtz and Mr. Estey to discuss the concerns outlined in the comments forwarded to the University by Mr. Estey.  The following Monday, March 17, 2008, Mr. Saadeh requested that Stratford University fund the build-out, a change from the terms of the February LOI which provided for $40.00 per square foot in tenant improvement. (Def.'s Ex. 74.)  In return, Mr. Saadeh would drop the rental rate from $25.00 per square foot to $22.00 per square foot. (Def.'s Ex. 74.)  Mr. Bretz did not do anything to look into the reasons for Potomac Medical's request for additional securitization of its investment in build-out or to advocate the reasonableness of Mr. Saadeh's position to Stratford.

11

Stratford University and its brokers treated Mr. Saadeh's request that Stratford fund the build-out as a rejection of the February LOI. On March 18, Mr. Bretz got Mr. Saadeh's approval that Potomac Medical was willing to proceed with the February LOI with the change that it would pay $13.00 per square foot towards tenant improvement and the lease rate would be $22.30 per square foot. (Pl.'s Ex. 47.) On March 19, 2008, Mr. Dovi concluded the new offer was not acceptable and that Stratford no longer had an interest in the property. (Pl.'s Ex. 48.) At that point, for all intents and purposes, the non-binding February LOI was a dead deal.

With the deal dead, on March 25, 2008, Mr. Bretz emailed Mr. Saadeh to confirm he had spoken to a prospective tenant for the property and sent Mr. Saadeh an attached proposal.

On March 25, 2008, Mr. Saadeh forwarded Mr. Peacock copy of the February LOI to develop a submission to Potomac Hospital. (Pl.'s Ex. 49.) On March 27, 2008, Mr. Peacock completed a draft proposal to be hand delivered to Potomac Hospital the following day, March 28, 2008. On April 2, 2008, Mr. Peacock emailed Ms. Michele Eckhardt of Potomac Hospital a financial analysis for the proposal for lease with Potomac Hospital.

On April 2, 2008, Mr. Saadeh and Mr. Peacock, in an email string, discussed the importance of keeping Potomac Hospital's interest in leasing space confidential and affirming that Mr.

Saadeh would honor the two small deals that G&E was still handling. (Pl.'s Ex. 57.) Both Mr. Saadeh and Mr. Peacock, in their efforts to interest Potomac Hospital, did not want to publicize the Hospital's potential interest in procuring a building as the publication of its interest would unduly attract other brokers with different properties. (Trial Tr., 49, July 9, 2009.)

E.   *End of Grubb & Ellis's Six-Month Lease Consummation Period*

On April 15, 2008, Mr. Saadeh emailed Mr. Bretz, stating that the Exclusive Agency Agreement had expired in November 2007 and that any registration period would end shortly. (Def.'s Ex. 91.) Mr. Saadeh believed that the Exclusive Agency Agreement was a 12-month commitment with a six month "tail" provision whereby any deals successfully consummated within the six months warranted the payment of commissions. (Trial Tr., 152, July 9, 2009.) On April 17, 2008, Mr. Bretz responded by email with an attached letter that stated,

> Grubb and Ellis, at your direction, has continued to market the property until your request for termination of representation on April 15, 2008, this letter shall serve as acknowledgment of termination of the listing. . . . Grubb & Ellis shall be compensated per the terms of the listing agreement if a lease is consummated within six (6) months of the termination of the listing.

(Def.'s Ex. 92 at 1952. Grubb & Ellis failed to acknowledge or discuss the statement made by Mr. Saadeh that the Exclusive Agency Agreement had expired and the registration period was also

13

coming to an end. (Def.'s Ex. 92.)

On May 16, 2008, Mr. Saadeh wrote a letter to dispute the assertion in the April 17 attachment that the six-month period would run from April, repeating his position that the Exclusive Agency Agreement expired in November 2007. (Def.'s Ex. 32B.) On June 9, 2008, Mr. Lipton wrote back to Mr. Saadeh and acknowledged that the Exclusive Agency Agreement had expired and was not renewed but asserted that continued representation by Grubb & Ellis entitled it to claim a commission. (Def.'s Ex. 33.)

On April 22, 2008, a week after Potomac Medical ended Grubb & Ellis's representation, Mr. Bretz sent Mr. Saadeh notice that Stratford University was off of the financial watch list and that the University had resolved an accreditation issue that was a matter of concern for Mr. Saadeh. (Pl.'s Ex. 69 at 2081.) Stratford University offered to resume negotiations under the same terms of the February LOI. (Pl.'s Ex. 69 at 2081.)

Mr. Saadeh responded by stating that, "The old deal is dead." (Pl.'s Ex. 69 at 2081.) Mr. Saadeh rejected the Stratford deal at the previously proposed terms contained in the February LOI. (Pl.'s Ex. 69 at 2081.) No lease between Potomac Medical and Stratford ever came to fruition under those terms.

On April 24, 2008, at 10:22 a.m., when Stratford learned that Mr. Saadeh did not consider the terms of the February LOI

14

acceptable, Mr. Estey advised Stratford that it was "definitely time to move on." (Def.'s Ex. 103.)  Mr. Dovi replied that he would send word that Stratford was no longer considering Potomac Medical's property, stating, "I will communicate on this end that there will be no more talk of Emads [sic] location." (Def.'s Ex. 103.)

At that point, Stratford University no longer considered Potomac Medical Building to be a viable option for Stratford. The previous day, Mr. Dovi had stated in an email to Mr. Flaggert and Dr. Shurtz that he thought that Mr. Saadeh was simply using Stratford as leverage to negotiate a better deal with Potomac Hospital. (Def.'s Ex. 102.)  Stratford began to examine other alternatives for office space. (Trial Tr., 7, July 8, 2009.)  On April 25, 2008, Mr. Bretz notified Mr. Saadeh that Stratford University had "moved on to another opportunity." (Pl.'s Ex. 75.)

Grubb and Ellis made no effort to explore alternative options with Stratford University.  Mr. Bretz did not meet with the Equis brokers, with Dr. Shurtz, or with Mr. Dovi.  (Trial Tr., 217, July 7, 2009.)  Mr. Bretz did not meet with Mr. Saadeh because he found Mr. Saadeh "difficult." (Trial Tr., 215, July 7, 2009.)

*F. Resuscitation of the Stratford Negotiations*

On May 6, 2008, Mr. Peacock emailed Mr. Saadeh and stated, "I think we may be able to resuscitate this deal." (Def.'s Ex. 132.) On May 6, 2008, Mr. Peacock emailed the brokers for Stratford University asking for Stratford University's 2007 tax returns. (Def.'s Ex. 133.) From May 9, 2008 through May 12, 2008, Mr. Peacock provided Mr. Saadeh with financial summaries relating to the Stratford deal. (Def.'s Ex. 135.) He relied on his preexisting business relationship with Mr. Estey to acquire financial information about Stratford University to better inform Mr. Saadeh of the University's financial standing. (Trial Tr., 89-90, July 9, 2009.) On May 13, 2008, Mr. Peacock emailed a proposal ("May LOI") to Stratford's brokers that increased the security deposit from $650,000 to $1,142,307.00. (Def.'s Ex. 139.) Stratford University accepted the May LOI and the parties eventually entered into a lease.

In June 2008, Grubb & Ellis knew Stratford University was in talks with Potomac Medical, and that the parties were in negotiations and working towards a lease. Despite this knowledge, Grubb & Ellis made no attempt to reinsert itself into the negotiations process.

A final lease was executed by Potomac Medical and Stratford University on July 14, 2009. (Def.'s Ex. 162.) The final lease contained terms different from the May LOI. (Def.'s Ex. 139.)

16

The May LOI (Def.'s Ex. 139) contained terms different from the February LOI (Def.'s Ex. 66).

Potomac Medical paid Stratford's broker a total of $495,708.13 in commissions, which reflected a four percent (4%) commission. (Def.'s Ex. 167.)   Potomac Medical paid Studley a total of $261,817.47 in commissions, which reflected a two percent (2%) commission. (Def.'s Exs. 166 & 169.)   Potomac Medical did not pay Grubb & Ellis a commission.

## II.   STANDARD OF REVIEW

A plaintiff alleging breach of contract, procuring cause, or quantum meruit must prove each element of its claim by a preponderance of the evidence. *See MDM Assocs. v. Johns Bros. Energy Techs., Inc.*, 63 Va. Cir. 113, 115 (Va. Cir. Ct. 2003) (breach of contract); *Atkinson v. S. L. Nusbaum & Co.*, 59 S.E.2d 857, 860 (Va. 1950) (procuring cause) (internal citations omitted); *WVC3 Group v. Plexus Scientific*, 2006 Va. Cir. LEXIS 71, *1 (Va. Cir. Ct. Apr. 7, 2006) (quantum meruit).   A party alleging fraud must prove each element of the fraud claim by clear and convincing evidence. *See Van Deusen v. Snead*, 441 S.E.2d 207, 209 (Va. 1994).

### III.   ANALYSIS

A.  *Breach of Contract*

The Court finds in favor of Defendant on Plaintiff's breach of contract claim because the Exclusive Agency Agreement automatically expired on November 1, 2007, by its express terms and because the February 20, 2008, email and the parties' subsequent conduct did not create a new enforceable agreement since no meeting of the minds occurred.

1.  Breach of Exclusive Agency Agreement

The Court finds that Defendant did not breach the Exclusive Agency Agreement because the Agreement was not renewed in the required manner and therefore expired on November 1, 2007.

A contract is "an agreement between two or more persons that creates an obligation to do or not to do a particular thing." *Buchanan v. Doe*, 431 S.E.2d 289, 292, (Va. 1993) (internal citations omitted).  To determine a contract's terms, a court looks to the "four corners" of the agreement to construe or interpret the parties' intentions. *Double Diamond Props., LLC v. Amoco Oil Co.*, 487 F. Supp. 2d 737, 744 (E.D. Va. 2007); *Heron v. Transp. Cas. Ins. Co.*, 650 S.E.2d 699, 702 (Va. 2007).

"A court is not at liberty to rewrite a contract simply because a contract may appear to reach an unfair result." *Rogers v. Yourshaw*, 448 S.E.2d 884, 888 (Va. Ct. App. 1994) (internal citations omitted).  Where the agreement is plain and unambiguous

18

in its terms, the rights of the parties are to be determined from the terms of the agreement and the court may not impose an obligation not found in the agreement itself. *Jones v. Jones*, 450 S.E.2d 762, 764 (Va. Ct. App. 1994) (internal citations omitted).

Here, the Court finds that the Exclusive Agency Agreement expired on November 1, 2007. By its express terms, the Agreement was to continue in full force and effect through October 31, 2007, unless renewed in writing prior to its expiration. (Pl.'s Ex. 1, ¶ 9.) The Agreement stated that it was "renewable upon mutual written agreement." (Pl.'s Ex. 1, ¶ 9.) Therefore, the Agreement automatically expired on November 1, 2007, unless the parties mutually agreed to extend it in writing prior to the expiration date. Furthermore, because the Agreement automatically expired on November 1, 2007, the six-month lease consummation period expired on May 1, 2008.

At trial, however, Mr. Bretz testified that the parties never executed a written extension prior to the November 1, 2007, expiration date. In fact, the only written instrument that purported to extend the Agreement, the email and attachment from Mr. Saadeh, was executed on February 20, 2008, nearly four months after the Agreement expired. (Pl.'s Ex. 3 at 1576.) In addition, the parties did not enter into the Stratford lease until July 14, 2008, over two months after the six-month period

19

ended.   (Def.'s Ex. 162.)

Plaintiff argued at trial that the parties had verbally agreed to an extension, but Plaintiff identified no contract modification that allowed a verbal extension to substitute for the written extension expressly required under the Agreement. Furthermore, Plaintiff presented no evidence indicating that the parties had even discussed such a modification.  As such, the Court finds that Defendant could not have breached the Exclusive Agency Agreement because it expired on November 1, 2007.

## 2.  Breach of a New Enforceable Agreement

The Court finds that Defendant did not breach a new enforceable agreement because neither the February 20, 2008, email nor the parties subsequent conduct operated to create a new agreement.  To create a contract there must be an offer and acceptance, with valuable consideration.  *Montagna v. Holiday Inns, Inc.*, 269 S.E.2d 838, 844 (Va. 1980).  To be valid and enforceable, a contract must be certain and the minds of the parties must meet in mutual agreement on every material phase constituting the agreement.  *Belmont v. McAllister*, 81 S.E. 81, 87 (Va. 1914).  "The minds of the parties must wholly meet, not partially meet.  The agreement must be integral, not fractional. The unity of the concordance must be reached by the parties, not imposed by the court.  A court is no oracle to divine assent where assent is wanting."  *Dickerson v. Conklin*, 235 S.E.2d 450,

455 (Va. 1977) (internal citations omitted).

Here, as to the February 20, 2008, email, the Court finds that no contract formed because no meeting of the minds occurred for two (2) reasons. First, the parties never executed a signed, written agreement. On October 5, 2007, Ms. Padgett sent Mr. Saadeh an extension letter to sign via overnight mail. (Pl.'s Ex. 2 at 1384.) On January 31, 2008, Ms. Padgett sent Mr. Saadeh a follow-up email which again asked him to sign an extension letter. (Pl.'s Ex. 2 at 1384.) However, instead of signing the letter drafted by Grubb & Ellis, Mr. Saadeh drafted his own letter and attached it to the February 20, 2008, email. (Pl.'s Ex. 3 at 1577.) Although the February 20, 2008, email stated, "Here's the extension," the attachment stated, "please accept this letter as *our intent to extend* Grubb and Ellis listing agreement throughout the Stratford University transaction." (Pl.'s Ex. 3 at 1577) (emphasis added). Mr. Bretz responded by email hours later, stating, "One small detail. [C]ould you sign the extension please[?] The attached wasn't." (Def.'s Ex. 29 at 2236.) Mr. Saadeh never signed the extension. That evening, Mr. Bretz emailed Mr. Saadeh and asked him to amend the language to read "please accept this letter *as an extension of the listing agreement . . .*" (Def.'s Ex. 31 at 147) (emphasis added). Mr. Saadeh never amended the language. A letter stating future intent does not create a presently enforceable agreement.

21

Second, the parties never agreed on all of the material terms governing their new relationship. An acceptance has to match the precise terms of the offer. *See Smith v. Farrell*, 98 S.E.2d 3, 7 (Va. 1957). If there are differences then the response is a counteroffer and a rejection of the offer, which creates no contract because there is no meeting of the minds as to every material term. *See Chang v. First Colonial Sav. Bank*, 410 S.E.2d 928,931 (Va. 1991); *Virginia Hardwood Lumber Co. v. Hughes*, 124 S.E.2d 283, 285 (Va. 1924); *Gibney & Co. v. Arlington Brewery Co.*, 70 S.E. 485, 487 (Va. 1911).

Plaintiff argued at trial that the February 20, 2008, email and attachment adopted the terms of the original Exclusive Agency Agreement, but the parties were not in agreement on all aspects of their brokerage relationship. Mr. Saadeh stated in the email, "You remember the concerns I have." (Def.'s Ex. 28 at 1022.) Mr. Bretz replied stating, "I understand the concerns. We should set a date for that discussion." (Def.'s Ex. 29 at 2236.) These concerns, although unspecified, must have arisen from the parties relationship originally created by the Exclusive Agency Agreement. Yet it is clear that at least some of the terms remained a source of concern for Mr. Saadeh. Neither Mr. Bretz nor Mr. Saadeh testified that a meeting ever took place to address the concerns or that the concerns were actually resolved. At trial, the parties did not agree as to precisely which terms

22

the parties had mutually agreed upon and which terms were the source of outstanding concern. As such, the February 20, 2008, email did not create an enforceable agreement because no meeting of the minds occurred as to all of the material terms. *Virginia Hardwood Lumber Co.*, 124 S.E.2d at 285.

Plaintiff's claim for breach of an oral contract fails for similar reasons. Plaintiff failed to establish at trial that the parties mutually agreed that Defendant would pay Plaintiff commissions even if Plaintiff was not the procuring cause of a lease.

Plaintiff's breach of contract claim appears instead to be one for promissory estoppel. Plaintiff seeks to hold Defendant liable for breach of contract based on Defendant's unilateral representations and conduct. However, Virginia does not recognize promissory estoppel as an affirmative cause of action. *W.J. Schafer Assocs. v. Cordant, Inc.*, 493 S.E.2d 512, 516 (Va. 1997). As a result, the Court finds for Defendant on the breach of contract claim because the original Agreement expired and because no meeting of the minds occurred to create a new enforceable agreement.

B. *Procuring Cause*

The Court finds in favor of Defendant on Plaintiff's procuring cause claim because there was a break in continuity in Plaintiff's services and because Stratford University was not ready to proceed with the transaction on Defendant's terms until after Plaintiff had already ceased work on the deal.

Under Virginia law "a real estate broker is the procuring cause of a sale when it has 'originated or caused a series of events which, without break in their continuity, result in the accomplishment of the prime object of [its] employment, which is, usually, to procure a purchaser ready, willing and able to buy on the owner's terms." *Shalimar Dev., Inc. v. FDIC*, 515 S.E.2d 120, 123 (Va. 1999) (quoting *Edmonds v. Coldwell Banker Residential Real Estate Servs.*, 377 S.E.2d 443, 445 (Va. 1989)) (emphasis added). Any break in the string of continuous events precludes a broker from being the procuring cause of the sale. *Id.* at 123. The Fourth Circuit requires that a "procuring cause" broker meet the following conditions:

> It is not enough that the broker has devoted his time, labor, or money to the interest of his principal, as unsuccessful efforts, however meritorious, afford no ground of action. And it matters not that after his failure and the termination of his agency what he has done proves of use and benefit to the principal. . . . He may have introduced to each other parties who otherwise would never have met; he may have created impressions which under later and more favorable circumstances naturally lead to and materially assist in the consummation of a sale; he may have planted the very seed from which others reaped the harvest; but all that gives him no claim. It was part of his risk that,

24

> failing himself, not successful in fulfilling his
> obligation, others might be left to some extent to avail
> themselves of the fruit of his labor.  To entitle a broker
> to commissions upon a sale or transaction which is actually
> consummated, *he must show that his efforts and services were
> the primary, proximate, and procuring cause thereof.*

*Tahir Erk v. Glenn L. Martin Co.*, 143 F.2d 232, 236 (4th Cir.

1944) (emphasis added).

Here, the Court finds that Plaintiff's procuring cause claim

fails because there was a break in continuity and because

Stratford was not ready to proceed with the transaction on

Defendant's terms until after the break in continuity occurred.

### 1.  Break in Continuity

The Court finds that the break in continuity in the series

of events caused by Plaintiff prevents Plaintiff from being the

procuring cause of the Stratford lease.  Virginia law recognizes

that a break in continuity defeats a procuring cause claim.  *See*

*Shalimar*, 515 S.E.2d at 123 (internal citations omitted).  Where

more than one broker is involved,

> [t]he broker who first directed the attention
> of the customer to the property may relax his
> efforts, with the result that a second broker
> may step in and by efficient and persistent
> work induce the customer to buy.  Thus the
> efforts of the second broker are the
> procuring cause of the sale.  To the first
> broker this is one of the inevitable risks of
> the business.

*Atkinson*, 59 S.E.2d at 861-62 (internal citations omitted).

Here, Plaintiff did more than relax its efforts; it

completely ceased its attempts to secure a lease with Stratford.

On April 23, 2008, Mr. Bretz sent Mr. Saadeh an email which stated that, "Stratford is ready to move forward under the terms of the previously agreed upon letter of intent [the February LOI]." (Pl.'s Ex. 69 at 2081.) Mr. Saadeh responded by stating that, "[t]he old deal is dead," and continued to express concerns about Stratford's financials. (Pl.'s Ex. 69 at 2081.) On April 25, 2008, Mr. Bretz emailed Mr. Saadeh and stated that "Stratford - has moved on to another opportunity." (Pl.'s Ex. 75.) Mr. Bretz made no attempt to meet with Mr. Dovi, the Equis brokers, or Mr. Saadeh after Mr. Saadeh stated that the deal was dead. (Trial Tr., 217, July 7, 2009.) Mr. Bretz testified that he did not make further attempts to negotiate the deal after April 25, 2008, because Mr. Saadeh was a "difficult landlord" and because he believed that Mr. Saadeh was not "willing or open to make any considerations." (Trial Tr., 215, July 7, 2009.) It is clear to the Court that Plaintiff gave up on the Stratford deal after April 25, 2008.

It was Mr. Peacock's efforts after Plaintiff gave up that resuscitated the Stratford deal and led to the consummated lease. Resuscitate is defined as "to revive from apparent death." RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY 1126 (2d ed. 2000). As to the Stratford negotiations, Mr. Peacock did just that. Mr. Peacock testified at trial that he met with the Stratford brokers and learned that their primary issue was with the security deposit.

(Trial Tr., 85, July 9, 2009.)  He also met with Mr. Saadeh on several occasions to address his stated concerns regarding the financial aspects of the deal and the sufficiency and level of securitization.  (Trial Tr., 85-87, July 9, 2009).  Mr. Peacock met with the parties face-to-face as opposed to relying on email communications because he found "communication much more effective in a face-to-face environment to get to the root of a problem."  (Trial Tr., 87, July 9, 2009.)  He further testified that he relied on his preexisting business relationship with Mr. Estey to acquire financial information about Stratford University to better inform Mr. Saadeh of the University's financial standing.  (Trial Tr., 89-90, July 9, 2009.)  Finally, the May LOI negotiated by Mr. Peacock proposed terms that were not part of the February LOI and that both parties ultimately found acceptable, including the form and amount of the security deposit.  (Trial Tr., 84-85, July 9, 2009.)  In fact, the parties would not have consummated a lease if not for Mr. Peacock's efforts following Plaintiff's decision to cease work on the transaction.  As such, the Court finds that a break in continuity occurred, thus preventing Grubb & Ellis from being the procuring cause of the Stratford lease.

2.   Ready, Willing, and Able to Proceed on Potomac
     Medical's Terms

The Court also finds that Plaintiff was not the procuring
cause of the Stratford lease because Stratford University was not
ready to proceed with the transaction on Defendant's terms until
after Plaintiff ceased work on the transaction.   To receive
commissions, a broker must produce a tenant ready, willing and
able to proceed on the owner's terms.  *See Shalimar*, 515 S.E.2d
at 123.

At trial Plaintiff argued that Stratford University was
always prepared to go through with the lease because it
ultimately did so.   Plaintiff also argued that, but for Mr.
Saadeh's bad faith efforts to stall the deal, the lease would
have been consummated under the terms of the February LOI.   The
Court is unpersuaded by Plaintiff's arguments for two (2)
reasons.

First, although Stratford was willing and able to go through
with the lease, it was not ready to do so until after Mr. Peacock
negotiated the transaction.   Mr. Dovi testified at trial that
Stratford was not ready to proceed with the transaction because
it was concerned about the form of the security deposit as stated
in the February LOI.   (Trial Tr., 127, July 8, 2009.)   Mr. Dovi
further testified that Stratford understood the February LOI to
require a cash security deposit, but that Stratford preferred to
instead provide a letter of credit.   (Trial Tr., 123 & 127, July

8, 2009.)  Mr. Peacock testified that he discussed with Stratford the nature and extent of the risk that Mr. Saadeh faced by leasing the facility to a university instead of a medical tenant. (Trial Tr., 85, July 9, 2009.)  Mr. Peacock also testified that, through these discussions, he was able to negotiate the form and the amount of the security deposit as reflected in the May LOI. (Trial Tr., 85-87, July 9, 2009.)  The initial form and amount of the security deposit prevented Stratford from being ready to proceed with the transaction until after Plaintiff ceased work and Mr. Peacock negotiated new terms for the security deposit.

Second, even if Stratford had been ready to move forward with the February LOI, Defendant's decision to modify its terms did not reflect bad faith.  The owner, Mr. Saadeh, is always the ultimate authority about under what terms and at what price it will lease or sell property.  Brokers may advise but the ultimate power is at all times with the owner.  As Potomac Medical's principal, Mr. Saadeh was entitled to set the terms for the sale or lease of the property.  Mr. Saadeh thought that Stratford was financially weak, and questioned why, despite the fact that it did millions of dollars in business, the university had an interim CFO and no accounting program.  (Trial Tr., 162, July 9, 2009.)  He became even more concerned about Stratford's financial strength because of the D&B report that he received.  (Trial Tr., 161-64, July 9, 2009.)  He also thought it risky to lease to

29

Stratford because, as a university, it had unique build-out needs. (Trial Tr., 85-86, July 9, 2009.)  Mr. Saadeh was entitled to change the leasing terms in order to alleviate these concerns.  The February LOI was a non-binding agreement to agree and the parties understood that neither was obligated until they had executed a lease.  For that reason, Mr. Saadeh's decision to reject the terms of the February LOI given the risk involved and the prospective tenant was not made in bad faith.  As such, the Court finds in favor of Defendant on the procuring cause claim.

C.  *Quantum Meruit*

The Court finds in favor of Defendant on Plaintiff's quantum meruit claim because Plaintiff failed to prove that the services it rendered were of value.  To prevail on a claim for quantum meruit, a plaintiff must prove that it (1) conferred a benefit on the plaintiff; (2) the defendant knew of or appreciated a benefit that was being conferred; and (3) that the defendant accepted or retained the benefit under circumstances that render it inequitable for the defendant to retain the benefit without paying for its value.  *T & M Elec. v. Prologis Trust*, 70 Va. Cir. 403, 405-406 (Va. Cir. Ct. 2006).  Under quantum meruit, a plaintiff is only entitled to recover the reasonable value of its services performed.  *See Mongold v. Woods*, 278 Va. 196, 203 (2009).  Recovery, then, is not measured by the benefit conferred on the defendant, but rather by the actual value of the services

30

performed.  *See Ricks v. Sumler*, 19 S.E.2d 889, 891 (Va. 1942);
*Hendrickson v. Meredith*, 170 S.E. 602, 605 (Va. 1933).

Here, Grubb & Ellis is not entitled to recover under quantum
meruit because there was no evidence presented at trial that the
services actually rendered by Grubb & Ellis were of any value.
As discussed above, Grubb & Ellis was not the procuring cause of
the Stratford lease.  Consequently, Grubb & Ellis is not entitled
to commissions and therefore is limited to recovery of the value
of the services it rendered to Potomac Medical.  The very nature
of the commercial real estate broker-principal relationship
precludes an implied contract claim here.  Grubb & Ellis entered
into this relationship with Mr. Saadeh contingent upon Grubb &
Ellis serving as the procuring cause of a lease.  The owner, Mr.
Saadeh, is not liable for time spent and marketing costs because
the owner never agreed to pay such costs and the law will not
imply such terms here where payment for these services was never
contemplated by the parties.  Mr. Bretz testified that Grubb &
Ellis posted listings for Potomac Medical Center on CoStar and
other listing services, created marketing materials, and set up
an email advertising system.  (Trial Tr., 51-53, July 7, 2009.)
He also testified that Grubb & Ellis provided Mr. Saadeh with
weekly reports of listing inquiries.  (Trial Tr., 53, July 7,
2009.)  But brokers often perform this type of work; there was no
showing that the work performed had value of itself.

Furthermore, Grubb and Ellis did not present any expert witnesses, produce any evidence of the independent value of its services at trial, or identify any documents in its exhibit list that establish such value or give the Court the proper basis for estimating the value of the services it performed.  As such, the Court finds in favor of Defendant on the quantum meruit claim.

D.  *Fraudulent Inducement and Concealment*

Finally, the Court finds in favor of Defendant on the fraudulent inducement and concealment claim because Plaintiff failed to prove that it reasonably relied on any purported misrepresentations made by Defendant or that it is entitled to commissions as damages.  In Virginia the elements of fraud are: 1) a false representation, 2) of a material fact, 3) made intentionally and knowingly, 4) with intent to mislead, 5) reliance by the part misled, and 6) resulting damage to the party misled.  *Bryant v. Peckinpaugh*, 400 S.E.2d 201, 203 (Va. 1991). Here, the Court finds that Plaintiff failed to prove its fraudulent inducement and concealment claim for the following three (3) reasons:  1) Plaintiff did not prove a false representation of a material fact; 2) Plaintiff did not reasonably rely on Defendant's alleged misrepresentations; and 3) Plaintiff did not prove that it was entitled to commissions as damages.

### 1.  False Representation of a Material Fact

The Court finds that Plaintiff failed to prove a false representation of a material fact because Plaintiff did not prove that Defendant had no intention of extending the Exclusive Agency Agreement at the time that he purportedly promised Plaintiff an extension.  "Because fraud must involve a misrepresentation of a present or a preexisting fact, fraud ordinarily cannot be predicated on unfulfilled promises or statements regarding future events."  *SuperValu, Inc. v. Johnson*, 666 S.E.2d 335, 342 (Va. 2008) (internal citations omitted).  To prevail on an actual fraud claim based on unfulfilled promises, a plaintiff must prove that the defendant had no intention of upholding the promise at the time the promise was made.  *See id.*; *Richmond. Metro. Auth. v. McDevitt St. Bovis, Inc.*, 507 S.E.2d 344, 348 (Va. 1998).

Here, Plaintiff argued at trial that Defendant fraudulently induced Plaintiff to continue work on the Stratford transaction by promising to extend the Exclusive Agency Agreement.  Plaintiff failed to prove, however, that Defendant did not intend to honor the promise at the time that it was made.  Mr. Saadeh testified that he told Mr. Bretz that he was thinking about an extension, but that he was "considering his options."  (Trial Tr., 145, July 9, 2009.)  He testified that he was taking his time to reach a decision because some of the promises made by Grubb & Ellis that led him to initially choose it as his exclusive broker never came

33

to fruition.  (Trial Tr., 147-49, July, 9, 2009.)  The Court
finds that Mr. Saadeh's indecision does not indicate that he
never intended to uphold any purported promises he made to
Plaintiff.  As such, the Court finds that there was no
misrepresentation of a material fact.

    2.  <u>Reasonable Reliance</u>

    The Court finds that Plaintiff did not reasonably rely on
any oral misrepresentations made by Mr. Saadeh because Plaintiff
continued to provide its services with full knowledge that Mr.
Saadeh never produced a signed extension of the Exclusive Agency
Agreement.  To prove fraud, a plaintiff must demonstrate the
right to reasonably rely on the misrepresentation.  *Metrocall of
Delaware v. Continental Cellular Corp.*, 437 S.E.2d 189, 193-94
(Va. 1993).  A plaintiff cannot prove reasonable reliance where
such reliance contradicts the express terms of the contract.  *See
Foremost Guar. Corp. v. Meritor Sav. Bank,* 910 F.2d 118, 126 (4th
Cir. 1990) ("there [can] be no reasonable reliance in the face of
plainly contradictory contractual language.").

    Here, Plaintiff failed to prove that it continued to provide
its brokerage services in reasonable reliance on Defendant's
assurance of receiving a signed extension.  Plaintiff knew that
the original Agreement had already expired before the parties
executed any purported extension.  As discussed above, the
Exclusive Agency Agreement was valid through October 31, 2007,

unless renewed by mutual written agreement.  (Pl.'s Ex. ¶ 9.)
Some three months later, on January, 31, 2008, Ms. Padgett sent
Mr. Saadeh an email acknowledging that "[t]he original listing
agreement for Potomac Medical Center expired in October of this
year." (Pl.'s Ex. 2 at 1384.)  After the expiration of the
Exclusive Agency Agreement, *no* brokerage agreement existed
between the parties.  Plaintiff requested a letter of extension
from Mr. Saadeh on several occasions from October 2007 through
February 2008. (Pl.'s Ex. 2 at 1384; Pl.'s Ex. 26 at 1408.)
Plaintiff never received a signed extension, yet Grubb & Ellis, a
sophisticated brokerage business, continued to provide services
on behalf of Potomac Medical.  Grubb & Ellis could have ceased
work on the transaction but continued instead to work in the
hopes that one day it would receive a signed, written agreement.
It did so at its own risk.  *See Virginia Business Exchange, Inc.
v. Mathews,* 38 Vir. Cir. 370 (Va. Cir. Ct. 1996) (broker's claims
for commission based on allegation of a promise to renew a
listing agreement denied because ". . .it is plaintiff which is
in the business of brokering the selling of businesses and which
relies on commissions to stay in business.  It should have done a
better job of protecting its interests here.").  Grubb & Ellis's
decision to continue work despite the absence of a signed written
agreement was a risk that it took, but that risk does not

35

constitute reasonable reliance. Therefore, the Court finds that Plaintiff's reliance was unreasonable.

### 3. Damages

Even if Defendant did make false representations, the Court finds that Grubb & Ellis failed to prove an entitlement to commissions as damages. To recover under a fraud claim, a plaintiff must prove damages caused by his detrimental reliance on the defendant's material misrepresentations. *See Murray v. Hadid*, 385 S.E.2d 898, 903 (Va. 1985) (internal citations omitted). The usual remedy for fraud is to restore the injured party to the position it held prior to the fraud. *See id.* at 904. A Plaintiff may, however, recover prospective profits upon a showing that he is entitled to those profits as damages. *See id.* (citing *Manss-Owens Co. v. Owens & Son*, 105 S.E.2d 543, 550 (Va. 1921)). "'It is well settled that . . . prospective profits are not recoverable in any case if it is uncertain that there would have been any profits. . . .'" *Id.* (quoting *Sinclair v. Hamilton & Dotson*, 178 S.E. 777, 780 (Va. 1935)).

Here, the Court finds that Plaintiff fails to prove its damages for two (2) reasons. First, Plaintiff asserts that it is entitled to commissions as damages because Defendant falsely represented that Plaintiff would receive commissions if it continued work on the Stratford transaction. As mentioned above,

36

Plaintiff was not the procuring cause of a lease and therefore is not entitled to commissions as damages.

Second, other than commissions, Plaintiff presented no evidence of fraud damages that it is entitled to. Although the plaintiff need not prove the exact amount of its damages, it must show sufficient facts and circumstances to permit the factfinder to make a reasonable estimate of its damages. *See Goldstein v. Kaestner*, 413 S.E.2d 347, 349-50 (Va. 1992) (internal citations omitted). Here, Grubb and Ellis did not present any expert witnesses to testify as to the value of its services, did not assign in its initial disclosure a value, did not produce in discovery evidence of any value, and did not identify any documents in its exhibit list that establish such value. In short, Grubb & Ellis failed to prove fraud damages. As such, the Court finds in favor of Defendant on Plaintiff's fraud claim.


IV.   CONCLUSION

The Court finds in favor of Defendant on all four (4) of Plaintiff's claims. First, the Court finds in favor of Defendant on Plaintiff's breach of contract claim because the Exclusive Agency Agreement automatically expired on November 1, 2007, and the parties' subsequent conduct did not create a new enforceable agreement. Second, the Court finds in favor of Defendant on Plaintiff's procuring cause claim because a break in the

37

continuity of Plaintiff's services occurred and Stratford was not prepared to proceed on Potomac Medical's terms until after the break in continuity.  Third, the Court finds in favor of Defendant on Plaintiff's quantum meruit claim because Plaintiff failed to prove that the services it actually performed were of any value.  Fourth, the Court finds in favor of Defendant on Plaintiff's fraud claim because Plaintiff failed to prove at trial that Defendant never intended to extend the brokerage agreement; because it was unreasonable for Plaintiff to rely on any representations not contained in a signed written agreement; and because Plaintiff failed to prove that it is entitled to recover damages.  Therefore, it is hereby

ORDERED that a VERDICT IS ENTERED in favor of Defendant Potomac Medical Building, LLC, on Plaintiff Grubb & Ellis Company's breach of contract, procuring cause, quantum meruit, and fraud claims.

The Court will enter a separate Federal Rule of Civil Procedure 58 Judgment Order.

The Clerk is directed to forward a copy of this Order to counsel.

Entered this 2/ap day of August, 2009.


Alexandria, Virginia

08/ 2/ap /09

_____
                    /s/
Gerald Bruce Lee
United States District Judge